IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| WESTERN WORLD INSURANCE COMPANY, | ORDER |
| Plaintiff, | AND |
| | MEMORANDUM DECISION |
| vs. | |
| | Case No. 2:06-CV-967TC |
| SPECIAL POPULATION LEARNING OUTDOOR RECREATION & EDUCATION, | |
| Defendant. | |
| JANE DOWNES, and ELLIE CUTTING | |
| Defendants in Intervention, Counterclaimants, and Third-Party Plaintiffs, | |
| vs. | |
| BEEHIVE INSURANCE AGENCY, INC., | |
| Third-Party Defendant. | |

Western World Insurance Company (Western World) filed this action seeking a declaratory judgment that it has no duty to defend or indemnify Special Population Learning Outdoor Recreation & Education (SPLORE) in an underlying personal injury action. SPLORE

purchased an insurance policy from Western World to provide liability coverage for a ski race hosted by SPLORE. The parties dispute whether that coverage applied to actions brought by injured race participants and whether volunteers are insured under the policy.

SPLORE and Jane Downes, a SPLORE volunteer,[1] moved for summary judgment, claiming that under the terms of the documents in SPLORE's possession at the time of the accident, SPLORE and Ms. Downes were entitled to coverage because either (1) the documents unambiguously did not exclude claims brought by participants from the coverage; (2) if the documents were ambiguous they must be construed in SPLORE's favor; or (3) in the event the policy excluded coverage for claims brought by participants, it was illusory and contrary to public policy. Western World opposed the motions for summary judgment, arguing that (1) the documents providing coverage were not ambiguous and clearly exempted claims against SPLORE brought by participants, and (2) the insurance was not illusory. In addition, the parties contest whether Beehive Insurance Agency, Inc. (Beehive), which acted as an intermediary between Western World and SPLORE during the application and purchase process, was an agent of SPLORE. Western World argues that Beehive was SPLORE's agent and therefore Beehive's knowledge, including policy documents in its possession, is properly imputed to SPLORE. Also disputed is whether the insurance policy provided coverage to volunteers like Ms. Downes.

The court concludes that Beehive was not acting on behalf of SPLORE when it received the policy documents and therefore its knowledge cannot be imputed to SPLORE. Furthermore, the insurance contract in place at the time of the accident unambiguously did not exclude

---

[1]Ms. Downes was positioned on the ski slope during the race to direct participants down the proper slope.

coverage for claims brought against SPLORE by injured participants.  Finally, the insurance

contract was ambiguous as to whether volunteers were covered by the policy and the agreement

must be construed in favor of coverage.  Accordingly, SPLORE and Ms. Downes's motions for

summary judgment are GRANTED.  (Dkt. No. 35 & 37)

## BACKGROUND

The Policy Application

SPLORE is a non-profit organization that provides outdoor programs to individuals with

disabilities or special needs.  To raise funds for its programs, SPLORE annually hosted the

Wasatch Overland Charity Ski Race (the Overland).  As part of preparations for the 2005

Overland, the executive director of SPLORE, Erik Rolstad, contacted Beehive to purchase a

general liability insurance policy.  While working with Beehive, Mr. Rolstad completed Western

World's Application for Special Event Policy (the "Policy Application").  (Def. SPLORE's

Mem. in Supp. Summ. J. Ex. B)  Western World operates in Utah through its agent, Risk

Placement Services (RPS).  Beehive worked with RPS to purchase the SPLORE policy.

Question 12 of the application asked the applicant to provide the "[n]ame of any Additional

insured."  (Id. at 2)  Mr. Rolstad listed Alta Ski Area and Snowbird Ski Area, the hosts of the

Overland, in response to this question.  Question 15 asked the applicant "[i]s coverage desired

for participants?"  (Id.)  Mr. Rolstad marked no to this question.  Beehive provided SPLORE

with certificates of liability insurance showing Snowbird and Alta were "additional insureds in

regard to Ski Race January 22, 2005."  (Def. SPLORE's Mem. in Supp. Summ. J. Ex. D)

On January 17, 2005, RPS sent Beehive a written quote.  In addition to providing the cost

of coverage and other terms, the quote included the statement "WW226 – Participants

Exclusion" under the heading "General Conditions, Exclusions (subject to final policy forms & wordings." (Pl.'s Mem. in Opp'n to Summ. J. Ex. C)  In addition, the quote clearly stated that "[t]he Client's Representative is NOT an agent of the insurer, and as such, cannot bind coverage nor make any commitments of behalf of the insurer nor of RPS.  (Id.)  Two days later, Beehive received a policy binder from RPS.  (Ex. D Pl.'s Mem. in Opp'n to Summ. J.)  The binder included the same participant exclusion as the quote and the same language regarding agency as the quote.  It also stated, in an "Important Notice to Broker," that the recipient does "not have any authority to act on behalf of the insurer nor of RPS."  (Id.)  The binder was written to the "broker," Beehive, and not to the insured.  Although Western World provided a policy binder to Beehive on January 19, 2005, Beehive did not send a binder to SPLORE until January 24, 2005, two days after the event had taken place.  (Ex. E Def. SPLORE's Mem. in Supp. Summ. J.)  The binder sent to SPLORE was prepared by Beehive and did not mention the participant exclusion. (Id.)

Policy Payment

To pay for the policy, SPLORE submitted a payment of $1,149.50 directly to Beehive on February 21, 2005.  (Ex. D Def. SPLORE's Second Supplemental Brief)  Payment was made pursuant to an invoice SPLORE received from Beehive and notices prepared by Western World and delivered with the policy on February 10, 2005.  The invoice stated that SPLORE was to pay $1,000 for a general liability policy, $100 for a "company fee," and $49.50 in taxes.  (Def. SPLORE's Mem. in Supp. Summ. J. Ex. E)  The policy notice explained the premium was $1,000, "policy fees" were $100, and taxes were $49.50.  (Def. SPLORE's Second Supplemental Brief Ex. C)

The invoice prepared by Beehive was created pursuant to the quote and binder sent to Beehive by RPS.  The quote and the binder both explain that the total charges of $1149.50 include a ten percent commission to Beehive of $100.  (Pl.'s Mem. in Opp'n to Summ. J. Ex. C; Pl.'s Mem. in Opp'n to Summ. J. Ex. D)  According to the binder that was prepared by RPS for Beehive, "If this item is premium financed, it is your obligation to inform us, at binding, of the company used, however this does not amend the payment terms between our offices."  (Pl.'s Mem. in Opp'n to Summ. J. Ex. D) (emphasis added).

Western World's process for receiving payment on an insurance policy operates through a series of transactions.  After an independent retail insurance company like Beehive receives payment from an individual purchaser, that company retains its commission and remits the remainder of the payment to RPS.  RPS then retains its own commission before remitting the balance to Western World.

The Accident

During the Overland on January 22, 2005, Thomas McCrory, a participant, was injured.  Ms. Downes was a volunteer at the Overland and was stationed near the site of the accident.  She had received instructions from SPLORE regarding her duties as a volunteer.  SPLORE reported the injury to Beehive on January 23, 2005.  On or about February 10, 2005, SPLORE received the Western World Policy containing a participant exclusion, providing "[t]his insurance does not apply to any claim arising from practicing for or participating in any event of a sporting or athletic nature."

Mr. McCrory filed a personal injury complaint in Utah state court against SPLORE and two SPLORE volunteers, including Ms. Downes.  After receiving Mr. McCrory's complaint,

Western World's representative wrote to Mr. Rolstad denying coverage for the claims brought against SPLORE.  Western World then filed this action seeking declaratory judgment that the Participant Exclusion in the Policy precludes coverage of Mr. McCrory's claim.  SPLORE counterclaimed, asking for a declaratory judgment that the Policy's Participant Exclusion is not applicable.  Ms. Downes intervened in this action as a defendant and counterclaimant.[2]

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Justice v. Crown Cork and Seal Co., Inc., 527 F.3d 1080, 1085 (10th Cir. 2008).  The court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008).  In this diversity action, the court applies the substantive law of the forum state, in this case Utah.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

## ANALYSIS

SPLORE and Ms. Downes advance three arguments in support of their motions for summary judgement.  They first maintain that the Policy Application and, if considered part of the agreement, the binder unambiguously did not exclude coverage for claims by injured participants.  They next argue that if the Policy Application does not unambiguously exclude

---

[2]A second volunteer, Ellie Cutting, also intervened in this action.  Ms. Cutting was dismissed with prejudice pursuant to a stipulated motions by the parties.  (Dkt. No. 42)

such coverage, it must be construed in favor of the insured.  Finally, they argue that if the coverage is interpreted to contain a participant exclusion, the coverage is illusory and contrary to public policy.

### 1.  Beehive's Agency when Delivering Policy Documents

Western World argues that when Beehive served as an intermediary between Western World and SPLORE, it was functioning as a broker for SPLORE.  Because Beehive was SPLORE's broker, Western World argues, its knowledge, including the information included in the binder received on January 19th, must be imputed to SPLORE.  In response, SPLORE and Ms. Downes argue that since 2003, Utah law has not recognized a distinction between brokers and agents and that now intermediaries such as Beehive are insurance providers and acting as dual agents.  SPLORE and Ms. Downes maintain that under this construction, Beehive's knowledge is not properly imputed to SPLORE.

The relevant statute reads:

(b) With regards to the selling, soliciting, or negotiating of an insurance product to an insurance customer or an insured:

    (i) "producer for the insurer" means a producer who is compensated directly or indirectly by an insurer for selling, soliciting, or negotiating a product of that insurer; and

    (ii) "producer for the insured" means a producer who:

        (A) is compensated directly and only by an insurance customer or an insured; and

        (B) receives no compensation directly or indirectly from an insurer for selling, soliciting, or negotiating a product of that insurer to an insurance customer or insured.

Utah Code Ann. § 31A-1-301(88)(b) (2008).  The evidence here shows that Beehive was not

acting as a "producer for the insured" when it collected payment and distributed policy documents. Although Beehive deducted its payment from the premium check made out to Beehive from SPLORE, that method of payment was dictated by an agreement between Beehive and RPS. This is clear from the documents sent to Beehive from RPS that dictate the commission rate. (Pl.'s Mem. in Opp'n to Summ. J. Exs. C & D) In addition, the binder sent from RPS to Beehive explicitly refers to the "payment terms between our offices," demonstrating that the agreement for Beehive's payment existed between Beehive and RPS, not Beehive and SPLORE. (Pl.'s Mem. in Opp'n to Summ. J. Ex. D) Under these circumstances Beehive was not compensated "directly and only by an insurance customer." Utah Code Ann. § 31A-1-301 (88)(b)(ii)(A) (2008).

But the statute alone does not resolve the agency issue. The court must also determine whether Beehive was SPLORE's agent under general agency principles. Vina v. Jefferson Ins. Co. of N.Y., 761 P.2d 581, 585 (Utah 1988) (holding that general agency principles must be considered in addition to the controlling statutes); Couch on Ins. 3d § 45:2 ("States have enacted a variety of statutes that address the capacity in which a broker or an insurance agent performs various duties. . . . These statutes may be relied upon to establish the legal relationship between the parties in the case, however, the statutes are not determinative of the issue."). Although the issue of agency is generally a question of fact, under Utah law where the evidence regarding the agent's authority is not disputed, agency is determined as a matter of law. Calhoun v. State Farm Mut. Auto. Ins. Co., 96 P.3d 916, 925 (Utah 2004). Although the parties here disagree on the question of agency, the facts underlying the agency question are not disputed. In particular, there is no argument that Beehive was responsible both for collecting the premium from SPLORE and

8

forwarding the policy documents SPLORE.

Even though no Utah authority exists on this issue, other courts have addressed the question of agency regarding a broker's responsibility for forwarding policy documents to an insured.  In general, these courts have held that while a broker is the agent for an insured when applying for and processing a policy, the broker acts as the agent of the <u>insurer</u> when it performs the additional duties of collecting a premium and delivering the policy documents to the insured. <u>Bowen Tree Surgeons, Inc. v. Canal Indem. Co.</u>, 591 S.E.2d 415, 417 (Ga. Ct. App. 2003); <u>Mann v. Interstate Fire & Casualty Co.</u>, 705 A.2d 360, 365 (N.J. Super. Ct. App. Div. 1998); <u>State Sec. Ins. Co. v. Burgos</u>, 583 N.E.2d 547552 (Ill. 1991) ("When a 'broker' performs the additional functions of delivering the policy to the insured and collecting premiums on behalf of the insurer, he is generally considered to be doing so as an agent of the <u>insurer</u>."); <u>City of Northglenn v. Chevron U.S.A., Inc.</u>, 634 F.Supp. 217, 225 (D. Colo. 1986); <u>Don Chapman Motor Sales, Inc. v. Nat'l Sav. Ins. Co.</u>, 626 S.W.2d 592, 597 (Tex. Ct. App. 1981) ("The rule is that although an insurance broker acts for the insured in making the application for insurance and in processing the policy, he acts for the insurer in delivering the policy and in collecting and remitting the premium."); <u>Puritan Ins. Co. v. Indust. Petrolic Corp.</u>, No. 89-2560, slip op. at 2 (E.D. Penn. Feb. 21, 1990).  In this case, RPS sent Beehive documents that were addressed to Beehive, not SPLORE.  It gave Beehive the authority to prepare the binder for SPLORE explaining the terms of Western World's policy.  By choosing to rely on Beehive in these dealings with SPLORE, RPS made Beehive a dual agent.  <u>Triage, Inc. v. Prime Ins. Syndicate, Inc.</u>, 887 A.2d 303, 308 (Pa. Super. Ct. 2005) ("By allowing collection of premiums and delivery of the policy by the designated broker, the insurer had engaged in affirmative acts consistent with an agency

relationship and therefore is sufficient to create one.")  When collecting the premium and

delivering the policy documents to SPLORE, Beehive was serving the interests of Western

World and RPS and cannot be said to have been acting as SPLORE's agent.  As a result,

Beehive's knowledge cannot be imputed to SPLORE.

### 2. Interpretation of the Existing Contract

The only documents known to SPLORE at the time of the accident were the Policy

Application and the certificates of liability.  Western World claims that the Policy Application

unambiguously provides no coverage for participants in any way.  SPLORE and Ms. Downes

maintain that the clear and ordinary meaning of the Policy Application demonstrates that while

the policy did not provide participants with insurance, it did provide SPLORE with insurance

against claims brought by participants.

Whether a contract for insurance is ambiguous is a questions of law.[3]  Alf v. State Farm

Fire and Cas. Co., 850 P.2d 1272, 1274 (Utah 1993).  "A contract may be ambiguous because it

is unclear or omits terms or . . . if the terms used to express the intention of the parties may be

understood to have two or more plausible meanings."  Id. (footnote and quotation omitted).  But

policy terms are not ambiguous simply because the parties make different interpretations

according to their own interests.  Id. at 1274-75.  Rather, "[a]n insurance policy is ambiguous

only if it is not plain to a person of ordinary intelligence and understanding."  Miller v. USAA

Cas. Ins. Co., 44 P.3d 663, 676 (Utah 2002) (quotation omitted).

If the language in a contract is unambiguous, "the parties' intentions are determined from

---

[3]A written application is generally subject to the same rules of construction as an ordinary
contract for insurance.  Couch on Ins. 3d § 11:2.

the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." Green River Canal Co. v. Thayn, 84 P.3d 1134, 1141 (Utah 2003). The court must construe the unambiguous language in a insurance contract "according to its plain and ordinary meaning." First Am. Title v. JB Ranch, Inc., 966 P.2d 834 (Utah 1998). The provision must be read with the policy as a whole. Utah Farm Bureau Ins. Co. v. Crook, 980 P.2d 685, 687 (Utah 1999).

The Policy Application unambiguously did not exempt coverage for claims brought by participants. Under the section heading, "General Liability," the form asked "Is coverage desired for participants?" (Ex. B Def. SPLORE's Mem. in Supp. Summ. J. at 2) Western World maintains that the phrase should be read to ask whether coverage is desired against claims from participants. SPLORE and Ms. Downes argue that in marking "no" to Question 15, Mr. Rolstad was declining additional coverage for participants as insureds, not declining coverage for claims brought by participants against SPLORE. The plain and ordinary meaning of the word "for" is consistent with SPLORE and Ms. Downes's reading of Question 15. Merriam Webster's Collegiate Dictionary explains that "for" is "used as a function word to indicate the object or recipient of a perception, desire or activity." Merriam Webster's Collegiate Dictionary 454 (10th Ed. 1995) (emphasis added). Here, the activity is providing coverage and the recipient is the participant. As a consequence, the ordinary understanding of the phrase "is coverage desired for participants" is whether the applicant desires to purchase insurance for the benefit of participants.

Western World argues that SPLORE's interpretation of Question 15 makes no sense when the Policy Application is considered as a whole. It points to Question 12, also in the "General Liability" section of the Policy Application, which asks the applicant for the "name of

11

any additional insured." (Ex. B Def. SPLORE's Mem. in Supp. Summ. J. at 2)  It also requests the mailing address of the additional insured and their interest in the event.  In response to this question, SPLORE listed Alta Ski Area and Snowbird Ski Area as additional insureds.  Western World argues that this demonstrates that it was not asking whether participants were also to be additional insureds in Question 15 , because this question had already been asked in Question 12.

This does not overcome the plain language of Question 15.  Question 12 is aimed at very different insureds than the participants discussed in Question 15.  That is, Question 12 asks about limited, identifiable insureds.  The request for a mailing address is made so that the insurer can send the insured liability certificates.  In fact, in providing the Alta and Snowbird address, SPLORE prefaced the address with the phrase "please mail to," reflecting the understanding that these insureds were to receive proof of insurance.  Participants, if provided coverage under the Western World policy, would likely be treated very differently in terms of notice and identification.  As a result, the presence of Question 12 does not make the plain language of Question 15 redundant or ambiguous.

### 3.  Coverage of Volunteers

Finally, the court requested supplemental briefing on the issue of whether Ms. Downes is covered as an insured under the Western World policy.  As previously explained, at the time of the accident the policy consisted of the Policy Application and certificates of liability.  It is undisputed that the Policy Application is silent on the issue of volunteers under the policy.  "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."  SME Indus., Inc. v. Thompson, Ventulett, Stainback and Assoc., Inc., 28 P.3d 669, 675 (Utah 2001)

(quotations omitted and emphasis added).  Here, terms governing the treatment of volunteers are missing from the contract and the Policy Application is ambiguous as a matter of law.

The Utah Supreme Court has explained that "[a]lthough we construe insurance contracts using the same interpretive tools we use to review contracts generally, . . . because insurance policies are adhesion contracts, they are to be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance." <u>Farmers Ins. Exchange v. Versaw</u>, 99 P.3d 796, 800 (Utah 2004) (quotations omitted).  As a result, "the insured is entitled to the broadest coverage he could reasonably understand from the policy." <u>U.S. Fidelity and Guar. Co. v. Sandt</u>, 854 P.2d 519, 522 (Utah 1993).

Here, SPLORE reasonably could have understood that an individual like Ms. Downes would be covered as an insured under the Western World policy.  Ms. Downes was a volunteer working at the direction of SPLORE's staff.  The Overland was put on through the efforts of numerous volunteers, like Ms. Downes.  These volunteers could reasonably be expected to be considered agents of SPLORE for purposes of coverage.  Ms. Downes is entitled to coverage as an insured.

## ORDER

For the foregoing reasons, SPLORE's motion for summary judgment is GRANTED (Dkt. No. 35) and Ms. Downes motion for summary judgment is GRANTED (Dkt. No. 37).

DATED this 6th day of February, 2009.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge

14